### FROST & CO. v. WEATHERSBEE.

1. A letter of guaranty in the following words, to wit: "In consideration of your agreeing to advance to W. & Co. not exceeding the sum of $7,000 and interest, I hereby guarantee to you the repayment of the sums advanced and commissions as agreed," is a limited and not a continuing guaranty.
2. The words "commissions as agreed" in this letter of guaranty did not mean that cotton purchased by the principal debtor should be received in payment of the guaranteed debt to the exclusion of subsequent advances made by the creditor to purchase cotton.
3. The facts of this case show a new and independent arrangement between this creditor and W. & Co. after the guaranteed debt was full, under which the creditor advanced moneys to W. & Co. to purchase cotton, which was to be shipped to the creditor; and these two debts, one secured by the guaranty and the other by the cotton, to be shipped, remained distinct, notwithstanding their entry upon the books of the creditor as one continuous account.
4. *Semble.* Where cotton is shipped by a debtor to a creditor holding two demands, the proper time for the debtor to direct application of payment is when the cotton is shipped, and not when its sale is ordered.
5. But money having been advanced by a factor to purchase cotton, upon the security of such cotton being shipped to him, the person receiving the advances cannot direct the proceeds of cotton so shipped to be applied to another debt.
6. And the creditor, as factor, had a factor's lien upon the cotton in his possession, it having been purchased with money advanced by him, and he therefore had the right to apply the proceeds of its sale to the repayment of his advances.
7. As it does not appear that any material fact or principle involved was overlooked in the decision, there is no ground for a re-argument. Petition for re-hearing therefore refused.

Before WITHERSPOON, J., Barnwell, March, 1884.

The Circuit decree, omitting such facts as are re-stated in the opinion, was as follows:

The defendant, A. J. Weathersbee, occupies the position of a surety. The contract of a guarantor or surety cannot be enlarged beyond its terms. The court say, in *Tinsley* v. *Kirby,* 17 *S. C.,* 4: "A rule never to be lost sight of in construing the

liability of a surety is that he is a favorite of the law, and has the right to stand on the strict terms of his obligation, where such terms are ascertained. This is a rule invariably recognized by the court, and is applicable to every variety of cases." Plaintiff's action is based upon written contracts of guaranty, and the guarantor's liability depends upon the construction of said contracts. The terms of the contracts, except as to amounts to be advanced, will be found in the paper signed by A. J. Weathersbee, February 1, 1881, as the paper subsequently signed May 26, 1881, merely furnishes a further guaranty for $1,500 more than it was at first agreed that plaintiffs should advance.

But for the expression in the guaranty, "and commissions as agreed," it seems to me that the intention of the parties could be readily discovered, and the contract would be free from ambiguity. The first paper states that the guarantor assumed the liability as surety for A. M. Weathersbee & Co., in consideration of plaintiffs agreeing to advance to the principal debtors not exceeding the sum of $7,000 and interest. This amount was increased $1,500, May 26, 1881, by the second paper referring to the limit in the original undertaking  It therefore appears that the contract expressly imposes a limitation upon the amount to be advanced with interest, and as this limitation was the consideration that induced A. J. Weathersbee to become guarantor, it must have been intended as a measure of the amount of the guarantor's liability to plaintiffs. The terms advance, accept, interest, and commissions, used in the guaranty, evidently contemplated the repayment at some future time.

I construe the terms, "and commissions as agreed," in the guaranty, to indicate that cotton was intended to be shipped plaintiffs by the principal debtor, as the medium for paying for the advances, and that the term commissions referred to some special rate of compensation agreed to be allowed plaintiffs for the sale of the cotton as factors. There was no antecedent debt due by the principal debtor to plaintiffs, as the principal debtors had just commenced business relations with plaintiffs. As three hundred bales had been mentioned as the probable amount of cotton that would be handled by the principal debtors, it would be reasonable for them to try and make special rates as to the com-

missions to be allowed on the sale of such a large lot of cotton. The defendant, A. J. Weathersbee, testifies that at the time he gave the guaranty he did not expect plaintiffs to advance to A. M. Weathersbee & Co. beyond the amount of the guaranty.

I am constrained to conclude and hold that under the contract of guaranty plaintiffs were limited to $8,500 advances to be made A. M. Weathersbee & Co., with interest, and that upon the payment of said sum and interest, by shipments of cotton by the principal debtors, the guarantor should be discharged. As already observed, plaintiffs' account shows payments by A. M. Weathersbee & Co. of the sum of $15,047.40. This view as to the intention of the parties is confirmed by the action of the plaintiffs. It appears by plaintiffs' account that A. M. Weathersbee & Co. commenced shipping cotton to plaintiffs on February 23, which was continued during the months of March and June. The proceeds of this cotton was applied as a credit upon A. M. Weathersbee & Co.'s account.

As already stated, on May 19 plaintiffs refused to honor a draft of A. M. Weathersbee & Co., giving them as a reason that they had drawn up to the guaranty (first guaranty), and that plaintiffs did not expect them to draw more until they had sent cotton. If the limit as to amount in the guaranty had referred to any balance due by principal debtors for advances, why should plaintiffs require additional guaranty when the principal debtors drew up to the limit in the first paper? The plaintiffs by their conduct have construed the original contract to be limited as to amount, and that the advances were to be paid out of cotton shipped them by the principal debtors.

It further appears that on August 31, 1881, one of the firm of A. M. Weathersbee & Co. applied to and obtained from plaintiffs the additional sum of $1,500 in cash, without security, to pay for goods to replenish stock and to move cotton crop. Thereafter plaintiffs continued to make advances, and A. M. Weathersbee & Co. continued to ship cotton to plaintiffs. Plaintiffs contend that this was the contraction of another debt by the firm of A. M. Weathersbee & Co., and that from August 31 the firm (principal debtors) owed them two separate and distinct debts—the one for advances secured by the guaranty, and the other for advances to

move the cotton crop. Plaintiffs therefore contend that they had the right to apply proceeds of cotton on hand November 1 to the unsecured advances made to move the crop.

The account presented by plaintiffs, however, is one entire running account, including debits and credits blended together. Plaintiffs protest against any inference being drawn from their mode of keeping books. It is the duty of the court to decide a case according to the law applicable to the case as presented. The principle of law is, that in an account current the payments shall be applied to the charges in the order of time in which they accrue. In such cases the debt consists not of the items, but of the balance found to be due after applying credits to debits. Under this principle of law I do not think plaintiffs can invoke the right of application of partial payments to this case.

But even assuming that A. M. Weathersbee & Co. contracted two separate debts, it would admit of doubt whether the money could be considered in the hands of plaintiffs until the cotton had been sold or ordered to be sold. It appears that when A. M. Weathersbee & Co., the principal debtors, on November 21 directed the sale and application of proceeds of cotton to the guaranteed advances, the cotton was then being held subject to order as to time of sale.

It was contended that the factor's lien attached to the cotton in the hands of plaintiffs to the extent of advances to move the crop. Having concluded that it was the intention of the parties at the time of the guaranty that payments by the principal debtors were to be first applied to the guaranteed advances, and that no further advances were contemplated, the factor's lien cannot be enforced in violation of such contract to the prejudice of the guarantor. I have no doubt, and it is reasonable to suppose, that plaintiffs expected the principal debtors to ship enough cotton to pay the guaranteed debt, as well as the extended credit for advances allowed the principal debtors. Unfortunately for all parties, the short crop of 1881 disappointed any such expectations, and, as already stated, the parties must now stand upon their legal rights.

It was further insisted that even if the contract of guaranty should be held to limit advances to $8,500, to be paid out of pro-

ceeds of cotton, the limit of credit was waived with the knowledge and consent of all parties, so as to include advances to move the crop. One of the plaintiffs testifies that the guarantor told plaintiff at the time that he overlooked and saw that the business of the principal debtors was kept straight. It also appears from the accounts that some of the drafts paid by the plaintiffs were for the benefit of the guarantor. The guarantor testifies that he delivered cotton to the principal debtors, to be shipped plaintiffs to meet the draft of $507.50 at the Bank of Charleston. He further testifies that he looked after the business of the principal debtors to see that the amount for which he endorsed was paid, and insisted that they should ship plaintiffs cotton enough for that purpose. Waiver of the items of the contract of guaranty is not alleged in the complaint, nor does the evidence establish the guarantor's liability beyond the terms of his contract upon which he is sued.

The plaintiffs in their complaint allege that certain transactions took place between the principal debtors and the surety to protect the surety from liability as guarantor to plaintiffs. Records of a confession and conveyances from the principal debtor to the surety were introduced before the master. The plaintiffs therefore demand that the guarantor should account to them for value of property of the principal debtors received by the guarantor as indemnity. The guarantor in his answer alleges and testifies that he advanced money to the principal debtors to enable them to commence business, and that he took possession of property of the principal debtors under the conveyances aforesaid in payment of *bona fide* indebtedness of said principal debtors.

The plaintiffs have had an opportunity before the master of interrogating the guarantor as to the character of the transactions between himself and the principal debtors above referred to. If the guarantor has received any of the property of the principal debtors to indemnify him against liability upon his contract of guaranty, he should be required to account therefor to plaintiffs. As the transactions last above referred to were between members of a family, about the time that the principal debtors were discovered to be insolvent, and as the guarantor admits he received property of the principal debtors, plaintiffs, if so advised,

should be permitted to require an accounting by the guarantor for the value of the property received by him from the principal debtors to indemnify him against liability upon his guaranty to plaintiffs.

AS MATTER OF FACT. I. I find from the evidence that there was but one debt between plaintiffs and defendants, as represented by the account current presented by plaintiffs. II. That the amount of advances made by plaintiffs to A. M. Weathersbee & Co., with interest and commissions, secured by the contract of guaranty of A. J. Weathersbee, dated February 1 and March 26, 1881, have been paid by the principal debtors.

AS MATTER OF LAW. I. I find that the contracts of guaranty signed by A. J. Weathersbee limited the amount of advances to be made by plaintiffs to A. M. Weathersbee & Co. to eight thousand five hundred dollars, with interest and commissions on sales of cotton to be shipped by said firm to plaintiffs as factors, to pay said advances and interest. II. That the defendant, A. J. Weathersbee, is not indebted or liable to plaintiffs upon the contract of guaranty for advances made to the defendants, A. M. Weathersbee & Co.

It is ordered, adjudged, and decreed, that plaintiffs have leave to apply to the Court of Common Pleas for Barnwell County for an order requiring the defendant, A. J. Weathersbee, to account for the value of property received from the defendants, A. M. Weathersbee & Co., to indemnify him under the contract of guaranty set forth in plaintiffs' complaint. Should plaintiffs fail to apply during the next two succeeding terms of the Court of Common Pleas for Barnwell County, after the filing of this decree, for the order herein provided, requiring the defendant, A. J. Weathersbee, to account, it is ordered, adjudged, and decreed, that plaintiffs' complaint herein be dismissed with costs.

*Messrs. Smythe & Lee,* for plaintiffs.

*Mr. H. M. Thompson,* contra.

The written contracts of guaranty are, by their express and unequivocal terms, limited and not continuing. *Rice,* 131. The

limitation upon the amounts to be advanced was the considera-
tion which induced A. J. Weathersbee to become guarantor, and
was the measure of the liability of the guarantor to the plaintiffs.
The contract of a guarantor and surety cannot be enlarged beyond
its terms.    17 *S. C.*, 4.    A material deviation from the contract
by a party claiming to enforce it rescinds the contract.  16 *S. C.*,
271;  14 *Ill.*, 20;  *Chit. Cont.* (10 *Amer. ed.*), 577.  The debtor,
in the first instance, has the right at the time of payment to
direct its application.   1 *McMull.*, 76; 9 *S. C.*, 344; 20 *Id.*,
46.    As the plaintiffs at the time of payment held no other debt
or claim against the principal debtors, distinct and separate from
the account current, to such account alone the payments must
necessarily be applicable.   In the case of current accounts the
successive payments or credits are to be applied to the discharge
of the items of debit antecedently due in the order of time in
which they stood in the account, which is not to be taken back-
wards, and the balance struck at the head instead of at the foot
of it.    *Story Eq. Jur.*, 469 *b, et seq.* ;  11 *Rich.*, 466.  A factor
cannot separate his account into independent items and subject
these items to different regimens to suit his own interests.    *Ibid.*
There can be no application of cotton or other commercial arti-
cles of uncertain or fluctuating value to an account until a sale
is effected.    Payment must necessarily mean money payment.
An order to a factor to hold cotton suspends its conversion into
money until further orders from shipper, as the factor or commis-
sion merchant is only the paid agent of the consignor, and bound
to follow the direction of the latter as to the consignments.  *Dud-
ley*, 248.    The "time of payment," referred to by the court in
*Bell* v. *Bell*, 20 *S. C.*, 47,  as the time for the debtor to make
the appropriation, has reference to the time when the cotton is
properly convertible into a circulating medium. · Directions by
the debtor, therefore, for application of proceeds should accom-
pany orders to sell.    The confession of judgment by A. M.
Weathersbee & Co. to A. J. Weathersbee was partly to indem-
nify the latter against the contingent liability of his guaranty to
plaintiffs, and partly to secure a debt due to himself individually.
The contingency did not happen, and never can happen, if the
liability of the guarantor is discharged by payment on the part

of the principal debtors; hence the plaintiffs have no subrogation to any rights acquired by A. J. Weathersbee under the confession of judgment or under any compromise thereafter made in satisfaction of said judgment.

*Mr. Robert Aldrich,* same side.

August 12, 1885. The opinion of the court was delivered by

MR. JUSTICE McGOWAN. The plaintiffs are factors and commission merchants, doing business in Charleston, and in 1881 the defendants, A. M. Weathersbee & Co., viz., Ashley M. Weathersbee, Martin F. Weathersbee, and John A. Weathersbee, were merchants doing business at Williston, in Barnwell County, and the other defendant, Allen J. Weathersbee, the father of two and the uncle of the other member of the above firm, was, as alleged, guarantor for them to the plaintiffs. On June 29, 1882, E. H. Frost & Co. recovered judgment against A. M. Weathersbee & Co. for advances made to them, for $7,117.56, besides interest and costs, and the execution issued thereon having been returned unsatisfied, they instituted these proceedings to recover the said judgment from Allen J. Weathersbee as the guarantor of the defendants in execution and to set aside certain conveyances, assignments, confessions of judgments, &c., alleged to be fraudulent, made by the firm of A. M. Weathersbee & Co. to the said A. J. Weathersbee for the purpose of transferring all their property in fraud of their creditors, &c.

The defendant, Allen J. Weathersbee, admitted that he had guaranteed to secure the plaintiffs for advances to A. M. Weathersbee & Co., to the extent of $8,500; but he pleaded payment, insisting that, although a large part of the advances made to A. M. Weathersbee & Co. had not been paid, yet that all moneys received by the plaintiffs from them should be applied to the amounts first advanced, which were covered by his guaranty, and beyond the amount of $8,500 he was not liable as guarantor. The principal question, therefore, was whether the guaranty of A. J. W. was a continuing guaranty, intended to cover, to its extent, the eventual balance between the parties; and if not, as to the proper application of the proceeds of certain cotton pur-

chased with money advanced by the plaintiffs for that special purpose, &c. The other defendants did not answer, but simply adopted that of A. J. Weathersbee.

The following is an outline of the principal facts. In the early part of February, 1881, A. J. Weathersbee and one or more members of the firm of A. M. Weathersbee & Co. went to the office of E. H. Frost & Co. in Charleston, for the purpose of getting advancements to run their business in Williston. The plaintiffs agreed to advance $7,000 upon condition that A. J. Weathersbee should guarantee the same, who signed the following paper:

"CHARLESTON, S. C., February 3, 1881.
"*Messrs. E. H. Frost & Co.:*

"DEAR SIRS: In consideration of your agreeing to advance to Messrs. John A. Weathersbee, Ashley M. Weathersbee, and Martin F. Weathersbee, doing business at Williston, S. C., under the firm name of A. M. Weathersbee & Co., not exceeding the sum of seven thousand dollars and interest, I hereby guarantee to you the repayment of the sums advanced and commissions as agreed. Yours respectfully,
"A. J. WEATHERSBEE.

"Witness:

"A. H. GERARD."

The plaintiffs on that day advanced to the firm of A. M. Weathersbee & Co. $2,000 in cash, and continued to accept their drafts until May 19, when they refused to honor another draft, because the balance on account was then as large as the guaranty, and, as they wrote, plaintiffs did not expect that they would draw any more until they sent cotton. A. M. Weathersbee & Co. replied that they were doing a larger business than anticipated and would need $1,500 more. Accordingly, on May 26, the firm delivered to plaintiffs an additional guaranty of A. J. Weathersbee for that sum, making the aggregate guaranty $8,500. The plaintiffs then continued to accept drafts until August 26, at which day the firm of A. M. W. & Co. owed the plaintiffs, balance of advances over receipts, the sum of $8,570, the full amount of the two guaranties, having sent but two bales of the new crop of cotton.

On August 31, one of the firm went to the city and, as Mr.
E. H. Frost swears, "told us he wanted $1,500 to pay for goods
to replenish his stock and to carry into the country in cash, so
as to have the means from both sources to move the cotton.    No
guaranty was spoken of for this loan, there was no question of
guaranty, no need for it.    The crop was made, was coming every
day to market, and this money was actually needed to move and
control the cotton by the sale of which the indebtedness was to
be paid," &c.    A. M. W. & Co. wrote to the plaintiffs, saying:
"We would be glad for you to furnish us with the money to pay
for cotton to be purchased, which we will forward to you as fast
as we get it."    In this way large advancements were made for
the purpose of buying cotton, which was shipped to the plaintiffs.

At the time the shipments were made no directions were given
except to hold for a better price.    Nothing was said about apply-
ing the proceeds until a large amount, nearly $10,000, had been
thus advanced, and a large quantity of cotton accumulated, when,
on November 21, A. M. Weathersbee & Co., by direction of A.
J. Weathersbee, wrote: "As our endorser, Mr. A. J. Weathers-
bee, is desirous of being relieved from any further liability for
the amount endorsed for us, you will proceed to sell our cotton at
once and apply net proceeds to credit of amount he has endorsed
for us."    The plaintiffs declined to make the application directed,
and declined to make further advances.    On December 9, one of
the firm visited Frost & Co., who were so well satisfied that A.
M. Weathersbee & Co. revoked their former order as to direction
of the proceeds of cotton, that they actually made the further
advance which they before had refused.

· On December 18, A. M. Weathersbee & Co. confessed a judg-
ment to A. J. Weathersbee for $12,000, for the purpose, as
stated, of securing him against his liability as guarantor as afore-
said, $8,500, and certain notes due by the members of the firm,
$3,500.    On December 19, two of the partners conveyed all
their real estate to A. J. Weathersbee, without stating any con-
sideration.    On December 10, the day after it was understood
that E. H. Frost & Co. objected to the proceeds of cotton being
applied to the guaranteed debt before the advances to purchase
it were paid, A. M. Weathersbee & Co. mortgaged all their stock

and animals as additional security for the aforesaid debt of $12,000. On February 28, 1882, A. M. W. & Co. also made an absolute assignment of all their property of every nature and kind whatsoever to further secure the aforesaid debt of $12,000.

The advances made by E. H. Frost & Co. exceeded their receipts, and, as before stated, they recovered judgment for the amount of $7,117.56, and instituted these proceedings to make the guarantor liable for the same. The cause came on for trial before Judge Witherspoon, who construed the words in the first guaranty "and commissions as agreed" to indicate that it was the agreement of the parties "that cotton was to be shipped plaintiffs by the principal debtors, as the medium for paying for the advances, and that the terms 'commissions' referred to some special rate of compensation agreed to be allowed plaintiffs for the sale of the cotton as factors," &c.; and holding that the guaranty was limited to $8,500, he decided that it was paid and satisfied by the proceeds of the cotton shipped to plaintiffs, leaving unpaid the advances to purchase it, as to which both the usual lien of the factor and an alleged new arrangement as to advances for the special purpose of buying cotton were excluded by the terms of the original contract of guaranty, that the advances were to be paid by the shipment of cotton. But the judgment gave permission to the plaintiffs to ask an account by A. J. Weathersbee, the guarantor, for the value of all property received by him from the principal debtors to indemnify him against liability upon his guaranty to plaintiffs.

From this decree both the plaintiffs and the defendant, A. J. Weathersbee, appealed, the latter because the plaintiffs were allowed an account against him for the property received by him as an indemnity as guarantor, and the plaintiffs filed twenty-one exceptions, which are in the Brief, and need not be restated here.

There are really but two questions in the case: First, whether the guaranty was in its character continuing, and intended to guarantee the credit of the debtors to the amount indicated, so as to cover any "eventual balance" which might exist upon an adjustment of the accounts of creditors and debtors; or simply a security to be paid and cancelled by the first money of the debtors which, in the course of business, reached the hands of

the plaintiffs; and if the latter, second, whether the guaranteed debt of $8,500 was paid by the direction of the debtors to apply the proceeds of the cotton in the hands of the plaintiffs to the payment of the guaranteed debt, leaving unpaid their advances to purchase the same.

The first question must depend upon the agreement of the parties as to the purpose of the original guaranty. What was that agreement? It is not easy to determine precisely. It was not committed to writing, for it is plain that the guaranty was only a part of the contract. There was not even a bond or note given for the amount guaranteed. Nothing clearly appears, except what may be inferred from the nature of the transaction and the relation of the parties. It is certain that the advances were not all made at the same time like a simple loan, but were to be made as occasion required to enable A. M. Weathersbee & Co. to carry on the business of their country store at Williston, receiving advances as their necessities required and making payments as they might be able. Under such circumstances a guaranty of a particular amount is generally given, not as a limit to the business, but as continuing in its nature and intended to cover and secure "any balance" which may appear upon adjusting the advancements and payments, as in *Conway* v. *Cunningham*, 6 *S. C.*, 351; *Witte* v. *Wolfe*, 16 *Ibid.*, 260; and *Kaphan* v. *Ryan*, *Ibid.*, 356. But in all these cases there was something which authorized that construction. In this case, however, we agree with the judge that nothing of the kind appears. The guaranty itself, by the words "not exceeding" the amount indicated, would serve to limit the amount to be advanced as if it were a simple loan of that sum, and as a consequence, we think, was subject to discharge by any proper payments by the principal debtors under their original contract.

But we do not concur with the Circuit Judge as to the scope and extent of that original agreement. He construes the guaranty as affording the evidence that the advances were to be paid in any "cotton" that the debtors might ship to the plaintiffs, whether it was really their property, received in the course of their ordinary business, or purchased on speculation with borrowed funds. The word "cotton" does not appear in the guar-

anty. Nothing was said about it when the guaranty was executed, except the casual remark of A. J. Weathersbee (when he was holding out inducements to obtain the advances), that the principal debtors would probably "handle about 300 bales of cotton," and from this remark, taken in connection with the last words in the first guaranty, "and commissions as agreed," the Circuit Judge reached the conclusion that the parties then agreed "that cotton [we suppose the aforesaid 300 bales] was to be shipped, as the medium for paying the advances, and the term 'commissions' referred to some special rate of compensation agreed to be allowed plaintiffs for the sale of the cotton as factors," &c.

It seems to us that the isolated, unexplained phrase, "and commissions as agreed," will not properly bear any such very wide and expanded construction ; especially when taken in connection with the fact that the guaranty then given was limited to $8,500, which, in such a large business as that indicated, would necessarily be swallowed up, and really amount to no security at all. If we assume that the agreement was to enable the parties to run their country store, we must also assume that it was to be run in the usual and ordinary way. There is not in the whole transaction an intimation that it was to be conducted in any other way, and we do not understand that it is any part of the legitimate business of a country store to speculate in cotton with money advanced for that purpose ; and we are satisfied that the original agreement of guaranty did not contemplate any such condition of things, or provide that cotton so purchased should be received in payment of the guaranteed debt, to the exclusion of advances made to purchase it. This is abundantly confirmed in various ways, but especially by the declarations of A. M. Weathersbee & Co., that they had enlarged their business, and on that account were continually calling for more money after they had received the full amount guaranteed.

Having concluded that the guaranty was not continuing in the sense of securing any "eventual balance," but limited to $8,500, like a simple loan of that sum ; the next question is whether that limited guaranty was paid and discharged by the direction of A. M. Weathersbee & Co. to apply to that debt the proceeds of the cotton purchased on speculation, leaving the advances made to

purchase it unsecured. We have just determined that such transaction was not within the original contract of guaranty. Was there a new and special arrangement upon the subject of purchasing cotton? On August 26 A. M. Weathersbee & Co. owed plaintiffs $8,570. This was secured by the guaranty, which was full to overflowing, and the plaintiffs had refused to make further advances. Mr. E. H. Frost swears: "On August 31 one of the firm came to the city and told us he wanted $1,500 to pay for goods to replenish his stock and to carry into the country in cash so as to have the means from both sources to move the cotton. No guaranty was spoken of for this loan, there was no question of guaranty—no need of it. The crop was made, was coming every day to market, and this money was actually needed to move and control the cotton, by the sale of which the indebtedness was to be paid, * * * in supplying these means no risk was to be run. They were advanced on the faith of the crop then coming to market, and were, of course, to be repaid from the first sales," &c. A. M. Weathersbee & Co. wrote for more money for the purpose of buying cotton. After inquiring about the cotton market and the advisability of continuing to purchase, they said: "We would be glad for you to furnish us with money to pay for same, which we will forward to you as fast as we get it."

We cannot resist the conclusion that this was a new arrangement for the purchase of cotton, over and above and outside of the original guaranty, with which A. J. Weathersbee had no concern, except, perhaps, to get credit on his guaranty for anything which A. M. Weathersbee & Co. might make clear in the business. It is perfectly certain that the plaintiffs so understood it. They so swear. They made these advancements after the original guaranty was full, and they had refused on the old arrangement to go further. It is not possible to suppose that they would have made these cotton advances for the mere purpose of receiving "cotton in payment" of their guaranteed debt, which was well secured, leaving the said advances unsecured. And we think that was also the understanding of A. M. Weathersbee & Co.; else why continue to ask for more money to buy cotton, with the promise that it should be sent forward to the plaintiffs "as soon

as we get it;" else why confess judgment and make mortgages, assignments, &c., to secure A. J. Weathersbee against his liability as guarantor, &c. ? We are constrained to conclude that as to the purchase of cotton there was a new arrangement, in which the cotton itself was to secure the advances for its purchase. There were, in fact, two distinct debts, one secured by the guaranty and the other by the cotton shipped. We do not think that a matter so important and vital should be controlled by the mere form in which the plaintiffs happened to keep their accounts.

Had A. M. Weathersbee & Co. the right to direct the proceeds of the cotton purchased with the advances made under this new arrangement, to be applied to the guaranteed debt, which had arisen under the original contract ? The doctrine of the application of payments has recently been fully considered by this court in the case of *Bell* v. *Bell* (20 *S. C.*, 34), in which it was held that "a debtor owing two debts to the same creditor has the right on making payment to direct its application. If the debtor has given no directions, the creditor may make the application at his pleasure," &c. In this case, while the advances were being made to purchase cotton, and the shipments to plaintiffs were being made, no instructions were given, except to hold for better prices. No instructions whatever were given as to the application of the proceeds until nearly ten thousand dollars had been advanced to buy cotton, and a large lot of cotton had been accumulated, when, on November 21, A. M. Weathersbee & Co., by direction of A. J. Weathersbee, wrote, directing "the cotton" sold at once and the proceeds applied to the payment of the guaranteed debt under the original agreement. This the plaintiffs at once declined, and again refused to make further advances.

It is manifest that if the plaintiffs had been aware of this view on the part of the debtors, the advances would not have been made ; and whatever may be the legal rights of the parties, it is clear that this silence while the advances were being made and the cotton was going forward, operated to mislead the plaintiffs. The rule is very positive, that if the debtor wishes to control the application, he must make the direction at the time of the payment. We incline to think that in this case the time of pay-

ment was when the cotton was shipped and put into the possession and under the control of plaintiffs, and not afterwards, when the cotton was ordered to be sold . As in the case of *Bell* v. *Bell,* *supra* : "There is no evidence that the debtor gave any direction as to the precise application when the consignments went forward. In the absence of this the creditor had the right to make the application." But without going into that we think that the arrangement as to the purchase of cotton amounted to a contract that these advances were made upon the condition that they should be first paid out of the sales of the cotton, which effectually prevented the direction afterwards attempted to be given.

Besides, it is admitted to be the general law that a factor, who advances money in the purchase of goods, has a lien upon them to secure such advances. Judge Story, in his work on agency, says: "A factor who has possession of goods, in consequence of its being usual to advance money upon them, has a special property in them, and a general lien upon them." See *Smith Merc. Law,* 151, and notes; *Bank* v. *Levy,* 1 *McMull.,* 435. The Circuit Judge fully recognized the general rule, but from the construction which he gave the original contract of guaranty, as embracing "the cotton" purchased under the new arrangement, he held "that the factor's lien cannot be enforced in violation of such contract to the prejudice of the guarantor." We have held that the original contract of guaranty did not embrace this cotton at all, and that the new arrangement, in precise unison with the principles of equity, and the factor's lien, made the cotton first liable for the advances made in its purchase. According to this view the plaintiffs, as factors in possession, had the right to apply the proceeds of sale, first to the advances made in purchasing it, and then the balance in liquidation *pro tanto* of the guaranteed debt. This was substantially done, in no way injuring the guarantor, A. J. Weathersbee, but, on the contrary, liquidating the debt for which he was clearly liable by the sum of $1,399.36, leaving the judgment for $7,117.56, with interest and costs, still to be paid by him as guarantor.

This view makes it unnecessary to enter into the question of account claimed against A. J. Weathersbee for the money and property alleged to have been transferred to him by A. M.

Weathersbee & Co., to indemnify him against all liability as guarantor for them as aforesaid.

The judgment of this court is that the judgment of the Circuit Court be reversed, and judgment entered against A. J. Weathersbee in accordance with the conclusions herein announced.

In this case a petition was filed, asking for a rehearing, alleging error in some of the conclusions of fact drawn by this court from the testimony, and more particularly alleging that the case did not show that all the cotton shipped by Weathersbee & Co. to Frost & Co. had been purchased with money advanced by Frost & Co., but, on the contrary, that defendant could show, if permitted so to do, that 185 bales of the cotton so shipped were obtained in the ordinary course of trade in payment of balances due on customer's ledger.

November 28, 1885.   The following order was passed

PER CURIAM.   We have carefully considered this petition. After the new arrangement that the plaintiffs should advance for the purpose of buying cotton, the proceeds of all the cotton received (except what was necessary to refund the advances and pay commissions) was credited upon the guaranteed debt, so that an inquiry whether the money advanced for the purpose of buying cotton was, or was not, actually used for that purpose, was not in the case.   As it does not appear that any material fact or principle involved was overlooked in the decision, there is no ground for a reargument.   The petition is dismissed.